UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
RICHARD T. MCMAHON,

                    Plaintiff,

                                          <u>MEMORANDUM & ORDER</u>
          -against-                       13-CV-4181(JS)

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.
------------------------------------X
APPEARANCES
For Plaintiff:      Christopher James Bowes, Esq.
                    Office of Christopher James Bowes
                    54 Cobblestone Drive
                    Shoreham, NY 11786

For Defendant:      Kenneth M. Abell, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    610 Federal Plaza, 5th Floor
                    Central Islip, NY 11722

SEYBERT, District Judge:

          Plaintiff Richard McMahon ("Plaintiff") commenced this

action pursuant to Section 205(g) of the Social Security Act, as

amended, 42 U.S.C. § 405(g), challenging defendant Commissioner

of Social Security's ("Defendant" or, the "Commissioner") denial

of his application for disability insurance benefits.

Presently pending before the Court are Plaintiff's and the

Commissioner's cross-motions for judgment on the pleadings.

For the reasons explained below, Plaintiff's motion is GRANTED

IN PART and DENIED IN PART, the Commissioner's motion is GRANTED

IN PART and DENIED IN PART, and this matter is REMANDED for

further consideration in accordance with this Memorandum and Order.

BACKGROUND

Plaintiff was a firefighter with the Fire Department of New York ("FDNY") from 1997 until May 21, 2010, when he retired on accident disability. (R. 104, 178-80.)[1] Plaintiff suffers from various respiratory and related illnesses and has injured both of his knees. He injured his right knee between 1993 and 1994 (R. 197) and then his left knee in an accident in 2008. (R. 190.) On September 11, 2001, Plaintiff was also a first responder to the disaster at the World Trade Center ("WTC"), where he was exposed to dust and the products of combustion (R. 258) which he believes led to mild persistent asthma, GERD, and polyps in his sinuses and larynx. (R. 120.)

On January 6, 2011, Plaintiff filed for disability insurance benefits ("DIB"), asserting that he had been disabled and, thus unable to work, since May 21, 2010, due to several conditions involving his lungs and both of his knees. (R. 86-89, 103.) On July 7, 2011, Plaintiff requested a hearing before an administrative law judge ("ALJ") (R. 52-53), which took place before ALJ Bruce MacDougall on March 28, 2012. (R. 22.) At the

---

[1] "R." denotes the administrative record which was filed by the Commissioner on October 21, 2013. (Docket Entry 7.)

hearing, the ALJ only heard testimony from Plaintiff, who was represented by counsel. (R. 24-44.)

The ALJ issued his decision on April 4, 2012 finding that Plaintiff is not disabled. (R. 9-11.) Plaintiff sought review of this decision by the Appeals Council and on May 20, 2013, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's decision final. (R. 1-3, 7-8.)

The Court will first summarize the relevant evidence that was presented to the ALJ, followed by a discussion of the ALJ's findings and conclusions as well as the Appeals Council's decision.

I. Evidence Presented to the ALJ

A. Non-Medical Evidence and Testimony

Plaintiff was born in 1963 and was forty-six years old at the time of his alleged onset date in March 2010. (R. 100.) He completed the twelfth grade in 1981, and he currently lives with his wife and two children in Commack, New York. (R. 104.) Plaintiff testified to the ALJ that his daily activities include watching TV, using the computer, occasionally going to store with his wife, very little cleaning, and attending his son's lacrosse games. (R. 40-41.) He also testified that he was in pain throughout the day, and that he was taking Ibuprofen on an almost-daily basis. (R. 29, 34.)

Plaintiff had been employed as a firefighter with the FDNY from 1997 until May 2010. (R. 104.) On his disability application, he stated that as a firefighter he frequently lifted fifty pounds or more, occasionally lifted 100 pounds or more, used machines, tools, equipment, and had technical knowledge and skills. (R. 105.) On September 11, 2001, and for some time after, Plaintiff was exposed to various particulate, smoke, and chemicals as a first responder to the WTC disaster. (R. 119.) On August 1, 2008, he was injured while working and twisted his knee. (R. 188, 190.) On May 21, 2010, the alleged onset date of his disability, Plaintiff retired from the FDNY on accident disability following a recommendation of the FDNY medical board based primarily on his respiratory issues. (R. 179-80.) He has stated that he has not worked since. (R. 27, 97-98.)

As to his orthopedic conditions, Plaintiff testified that he completely tore the ACL in his right knee, and damaged the ACL in his left knee. (R. 28-32.) He explained that the ACL in his right leg tore in the 1990s, that he had a surgery to clean up the meniscus but not to repair the muscle at that time, and that he was still able to work following this injury.[2] (R. 27-29.) He also explained that he had surgery to repair a torn

---

[2] The medical records for this surgery in the 1990s were not provided.

ACL in his left knee in 2008. (R. 30.) Plaintiff stated that his left knee was injured when he was struck with a hoseline, fell, and twisted his knee. (R. 188.) He testified to the ALJ that he had trouble standing, putting his shoes, socks, and underwear on, walking down the stairs, and that he would get sore if he stood and walked for more than a quarter of a mile. (R. 32-34.)

As to his respiratory and related conditions, Plaintiff testified that he had some trouble breathing, that he took Advair twice daily, and that he took Ventolin as a rescue inhaler if he had an asthma attack. (R. 35-36.) He also testified that he had several related conditions, including GERD, laryngitis, and polyps on his throat and sinuses. (R. 36.) He explained that he treated these conditions with Nexium, Famotidine, Nasonex, and nasal irrigation. (R. 117.) In his brief to the ALJ, Plaintiff stated that he believed these conditions were related to his work as a first responder to the WTC disaster, where he was exposed to toxic and irritant dust and smoke. (R. 118-20.) He testified that he could function normally to some capacity with the asthma, and that if he was around perfume or some type of stain or smoke, it may trigger an asthma attack. (R. 35-36.) Plaintiff stated that his other conditions led to a sore throat after speaking and sinus infections once or twice per month. (R. 36-37.)

As to his neurological and mental conditions, he testified that he had sensorineural hearing loss in his left ear and a white matter abnormality on his brain, and that he suffered from anxiety. (R. 37-40, 208.) For these conditions, he took Valtrex (Valacyclovir) which is an antiviral medication to prevent the hearing loss from spreading to his right ear, and Gabapentin for his white matter brain abnormality. (R. 39, 117.) He believed that the white matter abnormality led to a condition he explained caused episodes of sensitivity and pain on half of his face, which he described as similar to having shingles on one side of his face. (R. 37-39.) He also testified that the hearing loss in his left ear led to vertigo and nausea. (R. 42-43.) As to his mental conditions, Plaintiff testified that he was taking Ambien for sleeping and Alprazolam and Lexapro for general anxiety and depression. (R. 41-42.)

B.  Medical Evidence

On September 11, 2001, Plaintiff was admitted to New Jersey Liberty Hospital due to eye and lung irritation. (R. 198.) He reports that he last worked at the WTC in May of 2002. (R. 276.) On February 6, 2008, as part of a screening for WTC first responders, Plaintiff was given a low dose computed tomography ("CT") scan of his chest at NYU Medical Center, which revealed tiny nodules of "doubtful significance" and was found to be consistent with small airway inflammation with "mild air-

6

trapping in the lower lobes." (R. 287-88.) On February 29, 2008, he was examined by FDNY nurses for stress. (R. 248.) On March 14, 2008, he followed up with FDNY nurses and was cleared for full duty. (R. 247.)

On August 1, 2008, Plaintiff was injured while working when he was struck with a hose line causing him to fall down the stairs and twist his leg, and was treated by Dr. Maloney of the FDNY staff for back and knee strain. (R. 188, 190.) On August 4, 2008, Dr. Chandswang of the FDNY staff examined Plaintiff's back and leg, noted tenderness of the medial joint line, and ordered a Magnetic Resonance Imaging ("MRI") scan of his left knee. (R. 177.) On August 5, 2008, the MRI of Plaintif's left knee revealed a horizontal tear of the body and posterior horn of the medial meniscus and a chronic partial ACL tear. (R. 125.)

On August 21, 2008, Dr. Gasalberti of the FDNY staff examined Plaintiff, placed him on light duty, and recommended rehabilitation and a possible surgical consult if the condition did not improve. (R. 176.) On September 3, 2008, Dr. Gasalberti again examined Plaintiff and authorized him to undergo rehabilitation and to receive an ortho consultation. (R. 175.) On September 23, 2008, Dr. Mannor of the FDNY staff, following a consultation with Dr. Kelly, recommended physical therapy and placed Plaintiff on a light duty desk job. (R.

174.)  On October 14, 2008, Dr. Garvey of the FDNY staff noted that Plaintiff was considering surgery after consulting with Dr. Kelly and an orthopedic surgeon, Dr. Nicholas,[3] and recommended that he continue physical therapy and follow up with Dr. Nicholas.  (R. 173.)  On October 21, 2008, Dr. Mannor again recommended physical therapy and noted that Plaintiff may need surgery and scheduled a follow up appointment.  (R. 172.)  On October 28, 2008, Dr. Mannor, at the follow up appointment, authorized Plaintiff to undergo ACL reconstruction surgery.  (R. 171.)

On December 17, 2008, Dr. Stephen J. Nicholas performed an arthroscopy on Plaintiff's left knee to partially remove the torn meniscus and reconstruct the ACL with a bone-tendon-bone autograft.  (R. 280.)  On December 30, 2008, Plaintiff was examined by Dr. Marchisella of the FDNY staff, who authorized physical therapy and prescriptions.  (R. 170.)  On January 5, 2009, Dr. Mannor examined Plaintiff and noted that he was on one crutch, in physical therapy, wearing a brace, had a ninety degree active range of movement, and recommended that he continue treatment and follow up with his orthopedic surgeon.  (R. 169.)  On February 2, 2009, Dr. Mannor noted that Plaintiff had since stopped using crutches but still recommended physical

_____
[3] The actual report says "his initial Ortho (Nichols)," (R. 173) but this seems to be a reference to his Orthopedic Surgeon, Dr. Stephen J. Nicholas (see R. 280).

therapy and a brace. (R. 168.) On March 9, 2009, Dr. Mannor noted that he was doing well and experiencing normal side effects following the surgery and recommended that he continue physical therapy and remain on light duty. (R. 167.) On May 11, 2009, Dr. Mannor recommended the same. (R. 166.) On August 10, 2009, following a consultation with Dr. Nicholas on July 9, Dr. Mannor authorized Plaintiff to undergo surgery to remove the hardware from his knee because it was causing him pain. (R. 164.)

On October 9, 2009, Dr. Nicholas again performed an arthroscopy on Plaintiff's left knee, first diagnosing any problems, revealing a torn meniscus, then partially removing the torn meniscus, and finally removing the hardware installed in the previous surgery. (R. 277-78.) On October 20, 2009, Dr. Leo of the FDNY staff authorized Plaintiff to start physical therapy and to follow up with Dr. Mannor. (R. 162.) On November 2, 2009, Dr. Mannor noted that Plaintiff had a ninety degree active range of movement, recommended a follow up with Dr. Nicholas, and placed him on a light duty desk job with no kneeling or straining. (R. 161.)

On November 14, 2009, Plaintiff saw Dr. Weiden of the FDNY staff for orthopedic aftercare and complaints of cough and dyspnea, and was diagnosed with tracheitis. (R. 160.) A few days later, on November 25, 2009, he underwent another chest CT

and a pulmonary function test at NYU Medical Center. (R. 271-76.) The results of the CT scan, as compared with the earlier scan from 2008, revealed that the tiny nodules had not changed in size, and showed some fatty infiltration of the liver. (R. 271-72.) The pulmonary function test revealed a baseline FEV1 within normal limits, but an FEV1/FVC ratio suggested airflow obstruction. (R. 273-76.) On December 7, 2009, Dr. Mannor recommended that Plaintiff continue physical therapy. (R. 159.)

On December 9, 2009, Dr. Weiden reviewed the results from Plaintiff's tests and sent him for a methacholine challenge test. (R. 158.) On December 14, 2009, Plaintiff underwent the test, revealing a twenty-five percent drop in FEV1 suggesting bronchial hyper-reactivity in response to methacholine. (R. 268-70.) On January 2, 2010, Dr. Weiden reviewed the test results, diagnosed Plaintiff with asthma, and prescribed Advair. (R. 157.) On January 4, 2010, Dr. Mannor noted that Plaintiff's knee symptoms were unchanged, and that Dr. Weiden had recommended his case for review by an FDNY medical board. (R. 156.)

On January 11, 2010, Dr. Nicholas examined Plaintiff and reported that his range of motion was 0 to 130 degrees, that he could not perform a hop test, and that his knee felt unstable with side to side and pivoting maneuvers. (R. 267.) Based on this evaluation, Dr. Nicholas opined that Plaintiff was not fit

10

to return to active duty.  (R. 267.)  On January 16, 2010 and January 19, 2010, an FDNY physical board examined Plaintiff. (R. 154-55.)  On January 26, 2010, Plaintiff applied for WTC disability benefits for a lower respiratory condition, specifically asthma and reactive airway dysfunction.  (R. 181-82.)

On March 4, 2010, a three-physician panel for the FDNY Pension Board (the "Board") reviewed Plaintiff's case and requested that he stop taking Advair for two-to-four weeks and undergo a cold air challenge test before they could make a decision.  (R. 146.)  On March 25, 2010, Plaintiff underwent another pulmonary function test (R. 264), and on April 7, 2010, he underwent the cold air challenge test (R. 260-62).  On April 8, 2010, the Board reviewed Plaintiff's case again.  (R. 255.) The Board opined that Plaintiff had mild persistent asthma, precluding full firefighting, and granted him accident disability benefits and WTC disability benefits for a lower respiratory condition.  (R. 255.)  On May 21, 2010, he was granted accident disability and retired from the fire department.  (R. 180.)

On January 20, 2011, Plaintiff was examined by Dr. Marchesano of the FDNY staff for medical monitoring purposes. (R. 316.)  He was diagnosed with gastroesophagitis, prescribed 40mg Omeprazole, and placed on a diet to manage gastroesophageal

reflux disease ("GERD").  (R. 316.)  That day, as part of a WTC retiree medical monitoring program, Plaintiff also underwent a chest x-ray which revealed no acute disease.  (R. 354-55.)

On February 28, 2011, Dr. Saadia Wasty, a consultative examiner, performed an internal medicine examination of Plaintiff for the New York State Division of Disability Determination.  (R. 197-200, 201.)  Plaintiff stated that he started experiencing lung problems in 2007, including shortness of breath and tightness on exertion and when climbing stairs; and constant pain in both of his knees with sharp exacerbation. (R. 197.)  As to the lung issues, Dr. Wasty noted that he had been diagnosed with asthma in 2009, that he had experienced two asthma attacks but had never been hospitalized or intubated, and that he was on maintenance medication and used his inhaler a few times per month.  (R. 197.)  As to the pain, Dr. Wasty noted that Plaintiff was able to cook, clean sometimes, shop sometimes, shower, bathe, dress himself with help, watch TV, listen to the radio, read, go to the store sometimes, and socialize with friends.  (R. 198.)  She diagnosed Plaintiff with asthma, acid reflux, and knee pain status post ACL surgery.  (R. 200.)  She concluded that Plaintiff had a moderate to marked limitation to squatting and climbing stairs, and should avoid environments with smoke, dust, and other known irritants.  (R. 200.)

On October 1, 2011, Dr. Weiden diagnosed Plaintiff with gastroenteritis and chronic sinusitis, and authorized an Ear Nose and Throat ("ENT") evaluation with a laryngoscopy and a CT scan of the nose.[4] (R. 315.)

Before he could get an ENT evaluation, Plaintiff visited Dr. Anna Stern on October 18, 2011 with complaints of intermittent hearing loss for the past six months, dizziness, tinnitus, and vertigo. (R. 210-12.) Dr. Stern ordered a Contrast MRI scan of the brain, a tympanometry test of the ear, and a comprehensive hearing test. (R. 211.) On October 18, 2011, Dr. Edward Lipinsky performed hearing and tympanometry tests, which revealed essentially mild to moderate hill shaped sensorineural hearing loss, although Plaintiff showed excellent speech discrimination ability. (R. 214.) On October 20, 2011, Plaintiff underwent an MRI of his brain, revealing patchy white matter abnormalities asymmetrically distributed mostly on the right hemisphere, with no appreciable change since an earlier

_____

[4] Though Dr. Weiden's notes do not mention it, it seems he also switched Plaintiff's GERD medication from Omeprazole to Nexium. (See R. 362 (Nexium prescribed by Dr. Weiden on this date), R. 117 (Omeprazole not listed by Plaintiff on medication list).)

13

MRI from 2006.  (R. 208.)[5]

On November 22, 2011, Plaintiff saw Dr. Micheal Shohet for an ENT evaluation, complaining of mucus in the throat, coughing, ear popping, heartburn, hoarseness, dizziness, and left ear fullness.  (R. 209.)  Dr. Shohet performed a diagnostic fiberoptic endoscopy, and observed sinonasal edema, postnasal drainage, small non-obstructing polyps, and moderate to severe laryngopharyngitis with vocal cord edema and hyperemia.  (R. 209.)  Dr. Shohet diagnosed plaintiff with chronic rhinosinusitis with polyps and chronic laryngopharyngitis with reflux, referred him for a gastrointestinal ("GI") evaluation, increased his Nexium dosage, and prescribed Nasonex.  (R. 209.)

II.  The ALJ's Decision

After reviewing all of the above evidence, the ALJ issued his decision on April 4, 2012, finding that Plaintiff is not disabled.  (R. 12-18.)

At step one, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014 and that he had not engaged in substantial gainful activity since May 21, 2010.  (R. 14.)

---

[5] The document at R. 208 is an addendum dated October 27, 2011 to an MRI report dated October 20, 2011.  The original document is in the record at R. 364, but it is illegible apart from the date and Plaintiff's name.

At step two, the ALJ found that Plaintiff suffered from several severe impairments: right knee disorder, status post ACL reconstruction; left knee disorder, status post ACL reconstruction; and asthma. (R. 14.) The ALJ concluded that the left ear hearing loss, skin sensitivity, and vertigo were not severe impairments; that his hearing test reports showed "excellent" speech discrimination; the neurological examination reports showed "gross intact cranial nerves and symmetric reflexes;" and his physical examination reports of the skin showed no "nodules or induration." (R. 14.) As to his alleged depression, the ALJ concluded that it was not severe since it was not supported by any medical evidence. (R. 14-15.)

At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15.) The ALJ specifically considered Listing 1.02A, major dysfunction of joint involving one major peripheral weight-bearing joint, but rejected it because Plaintiff was able to ambulate effectively. (R. 15.) The ALJ also considered Listing 3.03, Asthma, but rejected it because Plaintiff did not show that the condition was accompanied by chronic asthmatic bronchitis or attacks in spite of treatment. (R. 15.)

As to steps four and five, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to

perform a wide range of sedentary work, was able to lift or carry up to ten pounds, sit up to six hours in an 8-hour day, stand or walk up to two hours in a day, and was restricted to occupations that did not require concentrated exposure to respiratory irritants. (R. 15.)

The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [this] functional capacity assessment." (R. 15.) He specifically considered left knee disorder, right knee disorder, and asthma, but explained that Plaintiff's subjective complaints were belied by the record. (R. 15.) As to the asthma, the ALJ cited Plaintiff's pulmonary function tests, the CT scan of his chest showing only mild air-trapping, the FDNY records showing that he had only "mild persistent asthma," and Plaintiff's lack of hospitalization or intubatation for his asthmatic condition. (R. 15-16.) As to the knee disorder, the ALJ noted that Plaintiff had not had any injections in his knees, was no longer going to physical therapy, and was only taking over-the-counter Ibuprofen for pain management. (R. 16.) As to his subjective complaints, the ALJ noted that Plaintiff was able to shower, bathe, and dress himself as well as cook, do

light cleaning, shop, and function with the use of his asthma medication. (R. 16.)

At step four, the ALJ concluded that Plaintiff was not able to perform any past relevant work, noting that his previous work was skilled, very heavy work, and that Plaintiff only had the RFC to perform sedentary work. (R. 16.)

At step five, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff can perform. (R. 17.) Using the Medical-Vocational Guidelines found in 20 C.F.R Part 404, Subpart P, Appendix 2 as a framework for decision-making, the ALJ concluded that Plaintiff's non-exertional limitations had "little or no effect on the occupational base of unskilled sedentary work" and found Plaintiff not disabled. (R. 17.)

## III. Decision of the Appeals Council

The Appeals Council denied Plaintiff's appeal of the ALJ's determination, stating that they "found no reason under [the] rules to review the Administrative Law Judge's decision." (R. 1.) Thus, the ALJ's decision is the final decision of the Commissioner. (R. 1.)

## DISCUSSION

## I. Standard of Review

In reviewing the ruling of the ALJ, this Court will not determine de novo whether Plaintiff is in fact disabled.

Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560. If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

## II.  Eligibility for Benefits

An applicant must be disabled within the meaning of the Social Security Act (the "Act") to receive federal disability benefits.  See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. § 423(a), (d).  A claimant is disabled under the Act when he can show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner must apply a five-step analysis when determining if a claimant is disabled as defined by the Act. See Shaw, 221 F.3d at 132.  First, the claimant must not be engaged in any substantial gainful activity.  See 20 C.F.R. § 404.1520(b).  Second, the claimant must prove that he or she suffers from a "severe impairment" that significantly limits his or her mental or physical ability to do basic work activities. See 20 C.F.R. § 404.1520(c).  Third, the claimant must show that his or her impairment is equivalent to one of the impairments

listed in Appendix 1 of the Regulations. See 20 C.F.R. § 404.1520(d). Fourth, if his or her impairment or its equivalent is not listed in the Appendix, the claimant must show that he or she does not have the residual functional capacity to perform the tasks required in his or her previous employment. See 20 C.F.R. § 404.1520(e)-(f). Fifth, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. See 20 C.F.R. § 404.1520(g). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. See Shaw, 221 F.3d at 132. "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citation omitted).

In the present case, the ALJ performed the above analysis, and his conclusions as to the first three steps are not in dispute. The Court thus turns to the remaining steps.

A. Plaintiff's Credibility

In his motion for judgment on the pleadings, Plaintiff asserts that the ALJ erred in finding that Plaintiff's testimony as to the intensity, persistence, and limiting effects of his symptoms was not credible. In her brief, the Commissioner asserts that the ALJ properly evaluated Plaintiff's credibility. The Court agrees with the Commissioner.

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," and the Court will uphold the ALJ's decision to discredit a claimant's testimony so long as the decision is supported by substantial evidence. Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (second alteration in original) (internal quotation marks and citation omitted). Plaintiff argues that the ALJ improperly relied on Plaintiff's activities of daily living as evidence of Plaintiff's ability to engage in sedentary work on a sustained basis. However, under the regulations, Plaintiff's activities of daily living are a factor that the ALJ may properly consider. See 20 C.F.R. § 404.1529(c)(3).

Additionally, the ALJ noted that Plaintiff's subjective complaints were inconsistent with his own testimony and other evidence. (See R. 15-16; compare R. 33-34 (testifying

that he has significant trouble walking) with R. 198-199 (noting that during the examination Plaintiff had a normal gait, and was able to rise from a chair without difficulty) and R. 34 (Plaintiff's testimony that he takes only over-the-counter ibuprofen as needed for pain); compare R. 35-36 (testifying as to the extent of his asthma) with R. 197 (noting that Plaintiff has only had two asthma attacks as of 02/28/2011 with no hospitalizations and no intubations) and R. 179 (noting that Plaintiff, when off his maintenance medication, used his rescue inhaler twice in a six week period).)

The contradictions noted by the ALJ in his decision constitute substantial evidence supporting the ALJ's decision to discount Plaintiff's testimony. See, e.g., Sisto v. Colvin, No. 12-CV-2258(JS), 2013 WL 4735694, at *10 (E.D.N.Y. Sept. 3, 2013); Vargas v. Astrue, No. 10-CV-6306, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011); Shriver v. Astrue, No. 07-CV-2767, 2008 WL 4453420, at *2 (E.D.N.Y. Sept. 30, 2008).

Plaintiff also argues that the ALJ failed to consider Plaintiff's good work history when making the credibility determination. While it is true that a good work history "'may be deemed probative of credibility,'" it is "'just one of many factors'" to be considered. Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (quoting Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998)); see also SSR 96-7p. However, the ALJ was certainly

aware of Plaintiff's work history, as he noted that his RFC prevented him from performing the duties of his past work as a firefighter. "That [Plaintiff's] good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination." Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011).

Accordingly, Plaintiff's motion in this respect is DENIED and the Commissioner's motion is GRANTED.

B.   Combination of Impairments

The Commissioner also asserts that there is substantial evidence to support the ALJ's RFC determination. Plaintiff argues that the ALJ failed to consider all of his conditions and their combined effect when assessing his RFC. The Court agrees with Plaintiff.

The regulations require that the ALJ consider "the limiting effects of all [the claimant's] impairment(s), even those that are not severe" when determining disability. 20 C.F.R. § 404.1545(e). Throughout the process, the ALJ must consider "the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. Since the ALJ did not consider all of

Plaintiff's impairments when assessing his RFC, remand is required.

When the ALJ assessed Plaintiff's RFC, he explicitly stated that "the record confirms a diagnosis of left knee disorder, . . . right knee disorder, . . . and asthma . . . ." (R. 15.) This list of impairments is the same as the list of impairments he found to be severe at step two, omitting Plaintiff's non-severe impairments. (See R. 14.) Additionally, even though multiple reports in the record suggest a diagnosis of GERD, chronic rhinosinusitis with polyps, and laryngitis/larynogpharyngitis, the ALJ does not reference these conditions anywhere in his opinion. (See R. 200 (diagnosing Plaintiff with acid relux); R. 209 (ENT confirming rhinosinusitis and larynogpharyngitis); R. 315 (Referral to ENT); R. 316 (diagnosing Plaintiff with GERD); R. 365 (Primary Care doctor confirming rhinosinusitis and laryngitis).) While the ALJ concluded that Plaintiff had asthma, impacting his lungs, these reports suggest that he also had conditions impacting his esophagus, larynx, and sinuses.

While the ALJ does reference Plaintiff's hearing loss, skin sensitivity, and vertigo at step two, he made no mention of Plaintiff's other non-severe impairments anywhere in the opinion and there is evidence to suggest that he only considered severe impairments when calculating RFC. While the ALJ need not recite

every piece of evidence that contributed to the decision, the Court must still be able to "glean the rationale of an ALJ's decision." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). Not only did the ALJ explicitly list only severe impairments when calculating the RFC, but he relied predominantly on Dr. Wasty's opinion to determine Plaintiff's RFC. Dr. Wasty's examination, however, was performed before Plaintiff had ever seen an ENT physician, and before he had undergone a neurological examination or a hearing test. (See R. 197 (Dr. Wasty's examination on 02/28/2011); R. 210-11 (MRI of the brain ordered on 10/18/2011); R. 214 (hearing test on 10/18/2011); R. 315 (Referral to ENT on 10/01/2011).)

Since the ALJ failed to consider all of Plaintiff's impairments and their combined effect in assessing his RFC, remand is required. See Burgin v. Astrue, 348 F. App'x 646, 648 (2d Cir. 2009) (remanding where, inter alia, the ALJ listed only some of plaintiff's impairments when determining RFC. Accordingly, Plaintiff's motion in this regard is GRANTED, and Defendant's motion is DENIED.

C.    Reliance on the Medical-Vocational Guidelines

Finally, Plaintiff argues that the ALJ improperly relied on the Medical-Vocational Guidelines (the "Grids") found in 20 C.F.R Part 404, Subpart P, Appendix 2 as a framework for decision-making at step five, and that he should have obtained

testimony from a vocational expert to address Plaintiff's non-exertional limitations. The Commissioner asserts that the ALJ's reliance on the Grids was appropriate. Given the need for remand, the Court cannot make a determination in this regard.

"[E]xclusive reliance on the [G]rids is inappropriate" where nonexertional limitations significantly diminish a claimant's ability to work. Butts v. Barnhart, 388 F.3d 377, 383-84 (2d Cir. 2004) (internal quotation marks and citations omitted). "Whether or not the grids should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved." Bogardus-Fry v. Astrue, No. 11-CV-0883, 2012 WL 3779132, at *15 (N.D.N.Y. Aug. 31, 2012) (citing Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)). This inquiry, however, necessarily involves consideration of Plaintiff's RFC. See id. (noting that the grids include consideration of a claimant's RFC); see also 20 C.F.R. § 404.1560(c) (providing that, at the fifth stage, the ALJ must consider, inter alia, the RFC).

Accordingly, given that the Court has remanded on step four of the analysis, this will necessarily impact step five. See Kelly v. Astrue, No. 09-CV-1359, 2011 WL 817507, at *14 (N.D.N.Y. Jan. 18, 2011) ("[T]he ALJ's RFC analysis was flawed and, as such, this aspect of the step five analysis should likewise be revisited on remand."), adopted by 2011 WL 807398

(N.D.N.Y. Mar. 2, 2011).  "On remand, depending on the renewed RFC assessment, it is possible that the use of a vocational expert could prove helpful."  <u>Compo v. Comm'r of Social Sec.</u>, No. 05-CV-0973, 2009 WL 2226496, at *10 (N.D.N.Y. July 23, 2009).

CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED IN PART and DENIED IN PART, Plaintiff's motion is GRANTED IN PART and DENIED IN PART, and this case is remanded for further proceedings consistent with this Memorandum and Order.  The Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED.


/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    July __29__, 2014
          Central Islip, NY